## KISLINGBURY v. EVANS.

No. 2261.    Decided January 31, 1912 (121 Pac. 571).

1. WITNESSES—COMPETENCY—TRANSACTIONS WITH DECEASED PERSONS. Under the statute prohibiting a party to testify to any transaction with a decedent, or to any matter of fact equally within the knowledge of the party and decedent, a plaintiff suing a decedent's estate for money loaned decedent on an open account is incompetent to testify, when shown a memorandum book and asked what it is, that it is the money that she loaned to decedent, and such testimony may not be considered as evidence of a loan.    (Page 357.)

2. EXECUTORS AND ADMINISTRATORS—ESTABLISHMENT OF CLAIMS—EVIDENCE—SUFFICIENCY. In an action against a decedent's estate for money loaned decedent on an open account, evidence, *held* not to support a finding that plaintiff loaned money to decedent.    (Page 358.)

APPEAL from District Court, Second District; *Hon. J. A. Howell*, Judge.

Action by Alice E. Kislingbury against Joseph E. Evans, as administrator of the estate of Joseph D. Carroll, deceased.

Judgment for plaintiff.    Defendant appeals.

REVERSED AND REMANDED FOR NEW TRIAL.

*C. R. Hollingsworth* and *T. D. Johnson* for appellant.

*Joseph Chez* for respondent.

STRAUP, J.

The plaintiff brought this action to recover the sum of $2250, which she alleged was loaned and advanced by her "on an open account" to the defendant's intestate at Elko, Nev., on the 5th day of October, 1907, and which he promised to repay on the 21st of July, 1908. The jury rendered a verdict for the plaintiff in the sum of $1,500, and $54.25 interest.

The defendant appeals, and assails the verdict for a want of evidence. We think the evidence is insufficient to sustain the verdict. Under our statute, the plaintiff was not a competent witness in her behalf as to "any statement by or transaction with" the deceased, "or matter of fact whatever which must have been equally within the knowledge of both" the plaintiff and the deceased. The plaintiff was a witness in her behalf. She testified that she was acquainted with the deceased; that she on the 5th day of October, 1907, was, and for about a year and a half prior thereto had been, living at Elko, where she conducted "a sporting house"; that on the 7th day of October of that year she left Elko and went to Reno, and from there to Ogden. The deceased was a married man, and resided with his family at Elko, where he was engaged in business representing the Becker Brewing Company. A number of questions were asked the plaintiff calling for answers which under the statute were clearly incompetent. The court prompty sustained objections to them. Then her counsel asked her: "I show you what purports to be plaintiff's Exhibit C, and ask you if you identify that?" She answered: "Yes, sir. Q. The book you identify? A. Yes, sir. Q. Is that your account book, or memorandum book? A. Yes, sir. Q. Is that the account or memorandum book you had during 1907 and 1908? A. Yes, sir. Q. And does that contain the entries that you made during that period? A. A part of them; yes, sir. Q. And are those entries in your handwriting? A. Yes, sir. Q. Are they what we call original entries? A. Yes, sir. Q. They were not copied into this book? A. No, sir. Q. Has the book been in your possession from that time? A. Yes, sir." The plaintiff then offered the book in evidence. The court sustained an objection to the offer. Plaintiff's counsel now insists that when the plaintiff was shown the book and was asked, "What is that?" and the plaintiff answered, "Why, it is the money that I loaned Mr. Carroll"—that, such testimony is evidence of the fact that she loaned money to the deceased. It is not. The positive command of the statute rendering the plaintiff an incom-

petent witness to give testimony as to such a fact or transaction cannot be avoided that way.

Plaintiff's principal witness was from Nevada. He testified that he had been a deputy sheriff, a constable, and night watchman, and that he was well acquainted with the plaintiff and the deceased. Some of his testimony is vague and rambling, and relates to matters wholly irrelevant to the issue. We have selected that portion of it which is most favorable to the plaintiff, and which most directly relates to the issue. He testified that he and the deceased at Elko in 1905 jointly purchased some real estate, and that the plaintiff in 1906 and 1907 rented of them one of the houses on the real estate, and used it for a "sporting house." He further testified that in 1906 and 1907 the deceased told him that "he was depositing money for her [the plaintiff] in the Henderson Bank," a bank at Elko, and that "he had the bank book which I saw showing different deposits, the same amounting to $200 or $300. I didn't read the passbook over. He showed me that she had $1500 or $1600 to her credit, it being deposited at different times, but I couldn't say as to the period of time it covered. . . . At another time he told me he had a couple of thousand dollars. He had it in Henderson's Bank where he always deposited it. He told me he had about $2000 of his own, but he didn't tell me where he had it deposited. As far as to my knowledge, he kept it in Henderson's Bank, and some of it in the First National Bank at Elko. He didn't have a deposit in Wells, Fargo Bank in Salt Lake City that I know of. I can't tell you if he had a deposit with Walker Bros. Bank at Salt Lake City. . . . I think he told me two or three different times about his taking money and depositing it for her, money given him to deposit. He said for Alice. He didn't say for Mrs. Kislingburg. These conversations were some two or three months apart. We would be talking about our rents, and he would bring this subject up. I had no occasion to. He would just volunteer and tell me that he was taking money for Alice, and putting it in the bank for her. He did that on two or three occasions. . . . I think the first conver-

sation I had with him was in November, 1907, shortly after he returned from a trip to Mexico," and after the plaintiff had left Elko, "and, as near as I can remember, we got talking about our affairs and other things together, and Mrs. Kislingbury was brought up. He always called her Alice, and he and I were talking, and he said that he had Alice's money in Walker Bros. Bank in Salt Lake City—something over $2000—but I don't remember just the exact amount that he stated. We talked on a while, he wanting to sell our real estate, and I not caring to sell mine. Carroll [the deceased] said that he wanted to sell out and go to Mexico, and invest some money down there, and he wanted me to go with him, but I told him no, I didn't care to sell my interest at the time. Finally, a few days afterwards, he came back and talked about selling, and finally I agreed, if he could get our price, that we would sell, and I told him, if he could get a buyer for $20,000, to sell it. . . . Our income from the houses which we rented was about $180 a month. He was trying to sell his residence and offered it for sale, and asked me to sell it for him for $5500. . . . A little while before Carroll was killed we were talking about Mrs. Kislingbury's money, our investments, and so on, and I told him, if he didn't quit his way of doing with women of this character, he would get into trouble. . . . In the spring of 1908 I met him in Golconda, Nev., where he had a lease on a mine about 120 miles from Elko. We got to talking about this lease, and he told me that he had about $4000 in it, but that he didn't have any of Mrs. Kislingbury's money in the mine, and that he didn't know whether it would make good, and I told him that I thought he had a dead one in that mine, and I didn't think it would pay." He testified that on another occasion, "I think, if I remember right, that he told me at that time that Alice wanted her money, that he guessed she was afraid he was going to beat her out of it, but he said he wouldn't. . . . A few days, possibly a week, before he was killed, he had sold some real estate for $2200. He wanted to sell the rest, and asked me to try and sell his residence for him; that he wanted to straighten up everything with Mrs. Kisling-

bury, stating that he was going to leave the country, and that, 'I don't want to beat her and her little girl out of a cent.' Nothing was said as to the amount he wanted to raise for Mrs. Kislingbury." The plaintiff also called the defendant, the administrator, who testified that he was appointed administrator of the estate to take possession of the goods and chattels belonging to the estate in this state, and that he received from Walker Bros. Bank in Salt Lake City in cash the sum of $1200.

This is all the evidence adduced by the plaintiff in support of the allegations of her complaint, and is that portion of the evidence which is most favorable to her. We think the question of insufficiency of this evidence to support the allegations of the complaint and the verdict is not open to debate. If the allegations of the complaint are true, the plaintiff is indeed unfortunate that the transactions in respect of her alleged loan were not evidenced by some writing; that she was not able to sustain her claim by the bank records or other evidence; and that her mouth, like that of the deceased, was closed. The vague and uncertain statements of her principal witness are far from proving the essential allegations of her complaint. They are neither certain nor definite as to any facts or transactions of a loan, or of money had and received, nor as to any amount, time, place, or circumstances of a loan. To take property from an estate on no more evidence than this, and to give it to another, is simply a judicial depletion of estates.

The judgment of the court below is therefore reversed, and the cause remanded for a new trial, costs to appellant.

FRICK, C. J., and McCARTY, J., concur.